Filed 6/24/25  P. v. Heizelman CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT HEIZELMAN,<br><br>    Defendant and Appellant. | D084202<br><br><br><br>(Super. Ct. No. SCD297727) |

APPEAL from a judgment of the Superior Court of San Diego County, Robert O. Amador, Judge.  Affirmed.

Laura Vavakin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

I

INTRODUCTION

A jury found Robert Heizelman guilty of making a criminal threat against A.M. (Pen. Code, § 422, subd. (a)),[1] and found he personally used a deadly or dangerous weapon—to wit, a box cutter—in the commission of the crime (§ 12022, subd. (b)(1)). The trial court sentenced him to an aggregate prison term of four years, consisting of the upper term of three years for the criminal threat conviction and one year for the weapon enhancement.

Heizelman appeals the judgment and claims the evidence was insufficient to support the conviction or the weapon enhancement. We reject this argument and affirm the judgment.

II

BACKGROUND[2]

A. *Incidents Prior to the Criminal Threat*

The victim, A.M., was the general manager of an L.A. Fitness gym in Kearny Mesa. Heizelman was a member of the gym.

Leading up to January 2023, Heizelman had numerous troubling encounters with other gym patrons and employees. On multiple occasions, patrons notified staff members that Heizelman had filmed them on his phone without their consent. A.M. and other employees tried to speak to Heizelman about the complaints. However, Heizelman walked away from the employees when they tried to confront him. During subsequent encounters, he became

---

[1]    Further undesignated statutory references are to the Penal Code.

[2]    We present the facts in the light most favorable to the judgment because Heizelman contests the sufficiency of the evidence supporting the conviction and the weapon enhancement finding. (*People v. Lee* (2011) 51 Cal.4th 620, 625, fn. 5.)

2

verbally abusive towards the employees. Relevant here, he used racial slurs and called A.M. vulgar and derogatory names when A.M. tried to speak with him.

Due to these incidents, Heizelman's gym membership was revoked. Building management also issued him a 100-yard stay-away order. Despite the stay-away order, Heizelman returned to the gym more than 10 times after his membership was cancelled. He recklessly drove his vehicle around the parking lot, parked in front of the gym, flipped off gym patrons and employees, and screamed out of the windows of his vehicle. Staff members told A.M. that Heizelman made them feel scared and uncomfortable. A.M. called 911 three or four times to report Heizelman's disruptive and dangerous conduct.

A.M. also saw the police arrest Heizelman twice for incidents unrelated to the crime. The police arrested Heizelman once because he became aggressive and threatened someone at a nearby retail store. The police arrested him a second time for pulling a knife on another manager at the gym, threatening to kill him, and possibly kicking him. A.M. witnessed both arrests.

B. *The Criminal Threat*

On January 28, 2023, A.M. was out to lunch when he received a call from an employee who said Heizelman "was back driving around crazy." The employee also told A.M. that Heizelman had parked his vehicle in front of the gym, entered the building, and yelled he would "burn this place down." Heizelman was not present when A.M. returned from lunch, but Heizelman reappeared in the parking lot soon afterwards and stood outside his vehicle.

A.M. walked through the parking lot and confronted Heizelman from a distance of 10 to 15 feet. A.M. was flanked by two of his employees and a

gym member, who stood behind and to the side of him. According to A.M., he did not want "to get too close" to Heizelman due to the prior knife incident involving A.M.'s co-manager. However, A.M. felt compelled to engage with Heizelman because he was within 100 yards of the gym and A.M. was "concerned for the safety" of his gym members.

As A.M. approached, he instructed Heizelman to leave the premises or the police would be called. Heizelman yelled at A.M. and called him vulgar names and racial epithets. A.M. cursed back at Heizelman in response. Then, one of A.M.'s companions alerted him that Heizelman had something in his hand. At that point, A.M. saw that Heizelman held a box cutter with an extended blade near his hip or waist area.

Heizelman stepped towards A.M. and his companions while holding the box cutter with the extended blade. A.M. took one or two steps back and warned Heizelman he would take physical action against him if he continued to move forward. Heizelman stopped advancing, but told A.M., "I'm going to fucking kill you," while he was about 8 to 10 feet away from A.M. Heizelman repeated this death threat three or four times. According to A.M., Heizelman also said, " 'I'm going to burn this place down….' " When later asked whether the blade was pointed at him during this exchange, A.M. said, "Yeah. I mean, he had the blade in his hand when he was saying that. So, I mean, I guess you could say it was pointed at me."

At trial, A.M. testified that he thought about his own safety and the safety of his staff members when Heizelman advanced on them with the box cutter and threatened to kill him. He told the jury, "what was going through my head was like this guy is going to come at me right now. I need to be prepared for anything." A.M. said he "100 percent" expected he might have to defend himself against Heizelman. Further, he testified he took the death

threat seriously because, "The way the world is right now … [A.M. could] expect anything from anybody at any given point." Like A.M., one of the other gym employees who was present took Heizelman's threat seriously and feared for the safety of himself and A.M.

A.M. called the police from his phone and handed the phone to one of his companions while he trained his undivided attention on Heizelman. A.M. wanted to focus on Heizelman because he did not know what Heizelman's capabilities were. The police arrived on the scene within three or four minutes and apprehended Heizelman.[3] In total, the interaction between A.M. and Heizelman lasted about 10 minutes.

The day of the arrest, A.M. spoke with a police officer in an interview that was recorded on the officer's body worn camera. During the interview, A.M. said, "[Heizelman] pulled out a blade, he pulled out of [sic] blades, said he was gonna kill me. I was like, but he was far away from me. So, I mean, obviously it's not a, I don't take it as a threat like that, but I told him, I was like, do not come near me with that shit. Cause I will, I, I mean, shit's gonna, shit's gonna go south, you know what I mean? Yeah. I was like, just get in the car. I was like, just leave. Just leave. … [¶] … [¶] … I don't know what's happening with this guy to be honest with you …." A.M. added, "I just told him, I was like, Hey, don't come near me with that. 'cause I'm telling you shit's gonna go south right now. And, and, um, he's like, yeah, I'm gonna fucking kill everybody up in that fucking gym. Like, fuck LA Fitness, blah, blah, blah. I'm like, all right my man. Just, you know, I don't understand. I don't like, I, I don't, I know that he's not mentally like there, but I don't know what he's capable of doing. You know what I mean? Either. I don't know if

---

[3]    When the police arrived, Heizelman walked to his vehicle and stashed the box cutter in the back of the vehicle.

he's all fired up, man." At trial, during the cross-examination of A.M., the defense played the body worn camera footage for the jury and moved to admit the interview transcript into evidence in an attempt to show that Heizelman's threat did not place A.M. in sustained fear for his safety.

On redirect, the prosecutor asked A.M. to explain what he meant when he told the police officer he did not "take it as a threat," and A.M. replied, "Well, the first – the first thought – like between my head – I mean, I'm an experienced mixed martial artist. I've been in combat sports for 18 years of my life. So initially I didn't feel like it was a threat like that. [¶] And I thought about it. I'm like, you know what? This is – this is just – not normal for somebody to come at you and say these things to you, you know? I don't know him. I really – you know, aside from the gym. [¶] I mean, that's why I felt threatened because I don't know his background. I don't know his past, if he has prior incidents or – I just know that I was there at that moment, and it happened, so I did feel threatened at that moment. [¶] … [¶] My first instinct was just to be alert, you know what I mean? [¶] Like I said, it was just at the beginning it was my adrenaline. Like, he's going to walk towards me and swing the knife at me, you know? But afterwards I did feel threatened because of the statements that he kept on making, you know?"

III

DISCUSSION

Heizelman challenges the sufficiency of the evidence supporting his criminal threat conviction. He also claims the evidence was insufficient to support the related sentencing enhancement for personal use of a deadly or dangerous weapon. For reasons we shall explain, we reject these arguments and conclude there was enough evidence to support both the conviction and the corresponding weapon enhancement.

6

A. *Standard of Review*

" 'When reviewing a challenge to the sufficiency of the evidence, we ask " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " [Citation.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for " 'substantial evidence—that is, evidence which is reasonable, credible, and of solid value' " that would support a finding beyond a reasonable doubt.' [Citation.] In doing so, we 'view the evidence in the light most favorable to the jury verdict and presume the existence of every fact that the jury could reasonably have deduced from that evidence.' [Citation.] 'We must also "accept logical inferences that the jury might have drawn from the circumstantial evidence." ' [Citation.] We do not question the credibility of a witness's testimony, so long as it is 'not inherently improbable,' nor do we reconsider the weight to be given any particular item of evidence." (*People v. Navarro* (2021) 12 Cal.5th 285, 302.)

We apply the same substantial evidence standard of review when assessing the sufficiency of the evidence to support an enhancement like the weapon enhancement at issue here. (*People v. Renteria* (2022) 13 Cal.5th 951, 971–972; *People v. Albillar* (2010) 51 Cal.4th 47, 59–60.)

B. *Substantial Evidence Supported the Criminal Threat Conviction*

The jury found Heizelman guilty of making a criminal threat in violation of section 422. To establish a violation of section 422, the prosecution must prove, beyond a reasonable doubt, "all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement ... is to

7

be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, ... so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228.)

Heizelman argues the evidence was insufficient to support the jury's finding that his threats placed A.M. in sustained fear for his safety. Case law defines "sustained fear" as fear experienced for "a period of time that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 (*Allen*).) "When one believes he is about to die, a minute is longer than 'momentary, fleeting, or transitory.' " (*People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349 (*Fierro*); see *People v. Culbert* (2013) 218 Cal.App.4th 184, 190–191 (*Culbert*) ["Even if the encounter lasts only one minute, a person who is confronted with a firearm held by an angry perpetrator and who believes his or her death is imminent, suffers sustained fear."].)

On the record before us, we conclude substantial evidence supported the jury's finding that Heizelman's death threats caused A.M. to be in sustained fear for his safety. In particular, the evidence of A.M.'s response to the threats on the day of the crime provides persuasive circumstantial evidence that he was in a state of sustained fear. That day, Heizelman repeatedly threatened to kill A.M. while armed with a box cutter that had an

8

extended blade.  When Heizelman advanced on A.M., A.M. did not stand his ground or close the distance between himself and Heizelman.  Instead, he stepped backwards and warned Heizelman not to come any closer.  He also immediately called the police from his cell phone and handed the phone to one of his companions so he could focus his full attention on Heizelman.  This evidence, which showed A.M. acting in a defensive and self-protective manner, supported the jury's implied finding that A.M. took the death threats seriously and feared for his safety.  (See *People v. Brugman* (2021) 62 Cal.App.5th 608, 634–635 (*Brugman*) [victim's call to police supporting finding of sustained fear]; *Culbert, supra*, 218 Cal.App.4th at p. 191 [sustained fear element satisfied where victim backed away from defendant and engaged in defensive conduct].)

A.M.'s past interactions with Heizelman also supported the jury's finding that Heizelman's threats caused A.M. to be in sustained fear.  (See *Allen, supra*, 33 Cal.App.4th at p. 1156 ["The victim's knowledge of defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear."].)  During A.M.'s prior exchanges with Heizelman, Heizelman called A.M. vulgar and racist names, incidents that were sufficiently serious they resulted in Heizelman's expulsion from the gym and the imposition of a stay-away order.  After Heizelman's gym membership was cancelled, his behavior became even more troubling.  He recklessly drove his vehicle around the gym parking lot, endangering the lives of the people who worked and patronized the gym.  Further, A.M. witnessed the police arrest Heizelman on two separate occasions before the day of the crime.  Once, Heizelman was arrested after he became aggressive with, and threatened, a customer or employee at a nearby retail store.  Another time, he was arrested because he pulled out a knife, threatened to kill, and possibly kicked A.M.'s

9

co-manager.  A rational jury could find A.M. feared for his safety in light of Heizelman's history of erratic, dangerous, and potentially violent conduct.

Finally, A.M. expressly testified that Heizelman's threats made him think about his safety and the safety of his staff.  He testified he "need[ed] to be prepared for anything," and he "100 percent" anticipated he would need to act in self-defense when Heizelman moved towards him with the box cutter.  A.M. also testified he took Heizelman's death threats seriously because, "The way the world is right now … [you] can expect anything from anybody at any given point."  A.M.'s testimony constitutes strong direct evidence that Heizelman's threats placed him in a state of sustained fear.  (See *Fierro, supra,* 180 Cal.App.4th at p. 1348 [victim's testimony he was scared constituted substantial evidence to support sustained fear finding]; *Brugman, supra*, 62 Cal.App.5th at p. 634 [substantial evidence supported finding of sustained fear where victim testified about her fear]; cf. *People v. Ortiz* (2002) 101 Cal.App.4th 410, 416–417 [sustained fear element satisfied even though victim did not testify that threat caused him to fear perpetrator].)

In arguing that substantial evidence did not support the jury's finding of sustained fear, Heizelman focuses predominately on A.M.'s recorded interview with the police from the day of the crime.  In the interview, A.M. said, "[Heizelman] was far away from me.  So, I mean, obviously it's not a, I don't take it as a threat like that."  According to Heizelman, this statement is an unambiguous admission from A.M. that he "did not take appellant's actions as threatening."  However, A.M. flatly rejected this claim when he was asked about it on redirect examination.  As A.M. explained, he "initially … didn't feel like it was a threat" when he first encountered Heizelman, but "afterwards [he] did feel threatened.  According to A.M., he felt threatened "at that moment" because he did not know the extent of Heizelman's "prior

10

incidents," Heizelman "kept on making" threats against him, and A.M. believed it was "not normal for somebody to come at you and say these things." Considering the evidence in its totality, including A.M.'s redirect testimony, the jury was free to infer that whatever fearlessness A.M. might initially have felt devolved into fear as his encounter with Heizelman progressed. (See *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1342 [substantial evidence supported sustained fear finding where victim testified she was not initially frightened].)

In light of A.M.'s testimony that he felt threatened, his knowledge about Heizelman's erratic, dangerous, and potentially violent tendencies, his defensive conduct on the day of the crime, and his call to the police, we conclude there was substantial evidence to support the jury's finding that Heizelman's death threats caused A.M. to be in sustained fear for his safety. Because Heizelman does not challenge the sufficiency of the evidence supporting any other element of the crime, the conviction must be affirmed.

C. *Substantial Evidence Supported the Weapon Enhancement*

The jury returned a true finding on a weapon enhancement allegation under section 12022, subdivision (b)(1). That provision states, "A person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, unless use of a deadly or dangerous weapon is an element of that offense." (§ 12022, subd. (b)(1).)

On appeal, Heizelman challenges the sufficiency of the evidence to support the jury's finding that he personally used a deadly or dangerous weapon in the commission of the crime. He argues the evidence proved only that he was armed with a box cutter, not that he used the box cutter to facilitate his criminal threat against A.M. We disagree.

11

" ' "In order to find 'true' a section 12022(b) allegation, a fact finder must conclude that, during the crime or attempted crime, the defendant himself or herself intentionally displayed in a menacing manner or struck someone with an instrument capable of inflicting great bodily injury or death." ' [Citation.] In determining whether there was substantial evidence of deadly and dangerous weapon use, 'we may properly consult cases construing the term "uses" in other enhancement statutes under " 'The Dangerous Weapons" Control Law.' " ' [Citation.] In that context, ' "[u]se" means, among other things, "to carry out a purpose or action by means of," to "make instrumental to an end or process," and to "apply to advantage." ' [Citation.] 'The obvious legislative intent to deter the use' of deadly and dangerous weapons in the commission or attempted commission of a felony 'requires that "uses" be broadly construed.' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 630.)

In the present case, ample evidence supported the jury's finding that Heizelman used the box cutter in his possession to facilitate the crime of making a criminal threat. At trial, there was evidence Heizelman held the box cutter in plain sight with the blade extended and pointed it towards A.M. during the encounter in the parking lot. In particular, there was evidence Heizelman kept the box cutter and its extended blade out where A.M. and his companions could (and did) see it—all while repeatedly threatening to kill A.M. and taking steps towards him from a close distance of 8 to 10 feet.

In his appellate brief, Heizelman claims the evidence was insufficient to support the weapon enhancement, in part, because he testified at trial that he had an explanation for holding the box cutter that was unrelated to the criminal threat. Specifically, he testified that he bought food prior to the confrontation and was in the midst of cutting the food when A.M. and his

12

companions approached him.  However, the jury reasonably could have discredited Heizelman's self-serving testimony.  Alternatively, the jury could have found that Heizelman initially held the box cutter for the purpose of cutting his food, but then kept it displayed in plain sight for the entire 10-minute ordeal that followed in order to instill fear in A.M. and convey the severity and seriousness of his threats.  On a sufficiency of the evidence review, it is not our duty to reweigh the evidence and usurp the jury's fact finding role.  (See *People v. Lindberg* (2008) 45 Cal.4th 1, 27 ["A reviewing court neither reweighs evidence nor reevaluates a witness's credibility."].)

As part of his challenge to the sufficiency of the evidence, Heizelman also emphasizes that he never raised the box cutter above his waist or hip during the confrontation.  However, even if he kept the box cutter near his waist or hip, he still displayed it in plain sight and pointed the box cutter blade towards A.M. while repeatedly threatening to kill him.  A rational juror could conclude he displayed the box cutter and its blade for the purpose of bolstering his threat and instilling fear in A.M. that he would use the box cutter to kill him or inflict serious bodily harm.  (See *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1200 ["[Defendant's] intentional use and display of a knife to intimidate and control the victims who either saw the knife … or were made aware of its use … facilitated defendants' plan to murder"], abrogated on another point by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

## IV

## DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

IRION, J.

RUBIN, J.